NOT DESIGNATED FOR PUBLICATION

No. 116,124

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Marriage of

JEANA L. DACUS,
*Appellant*,

and

DAVID DACUS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Reno District Court; TRISH ROSE, judge. Opinion filed June 2, 2017. Reversed and remanded with directions.

*Shannon S. Crane*, of Hutchinson, for appellant.

*Thomas A. Dower*, of Gilliland & Hayes, LLC, of Hutchinson, for appellee.

Before BUSER, P.J., PIERRON and STANDRIDGE, JJ.

*Per Curiam*:  Jeana Dacus filed for divorce from her husband, David Dacus. The couple had one daughter, M.D., born in 2008. After a bench trial, the district court awarded primary residential custody to David. Jeana appeals, arguing the court did not properly consider the factors under K.S.A. 2014 Supp. 23-3203 in making its decision. We reverse and remand with directions.

1

Jeana Dacus filed a petition for divorce from David on May 5, 2015. M.D. was 7 years old at the time of the divorce proceedings. Jeana had two children from a previous marriage: Garren, age 15, and Shawna, age 20.

M.D. was born in Oklahoma and lived there with Jeana until August 2008. In August 2008, Jeana and David wed. Over the course of the marriage, Jeana moved back and forth between Oklahoma and Kansas with the children while David remained in Kansas. In total, M.D. spent approximately 3 1/2 years living with Jeana in Oklahoma and 4 years living with Jeana and David in Kansas. Since June 2014, M.D. had been living in Hutchinson.

On May 7, 2015, Jeana filed a motion for temporary orders and requested joint custody with residential custody going to her. She also requested temporary possession of the marital residence until the end of May 2015, at which time she intended to return to Oklahoma. The district court granted the order.

On June 25, 2015, David filed a motion to modify the district court's temporary orders and requested temporary residential custody. On September 8, 2015, the court granted David's motion.

On September 3, 2015, Jeana filed a motion for a review hearing. In the motion, she alleged M.D. was not adjusting well to being away from her mother and half-siblings. Jeana claimed M.D. frequently cried at both Jeana's and David's homes. She also alleged school counselors had told her M.D. cried at school and had told them she did not want to live with her father.

On September 17, 2015, Jeana filed a motion to appoint a guardian ad litem (GAL). The district court appointed Ellen Neufeld as GAL on October 9, 2015. Neufeld

2

made a report for the court based on interviews she conducted with a number of individuals close to the case.

Neufeld interviewed M.D. who told Neufeld she would be most comfortable living with her mother. When asked to explain, M.D. said her mom was nicer, her dad was rude sometimes, and she would have more fun living with her mom. When asked to explain what she meant by "rude," M.D. said her dad gets mad for no reason, yells sometimes, and one time dragged her down the hall by her left arm. She also said she missed living with her older brother and sister.

Neufeld spoke with Jeana who stated she currently lived in a three-bedroom rental home in Ardmore, Oklahoma, with Garren and Shawna. She had been working as an office manager for 1 month.

Jeana told Neufeld that David had been verbally and emotionally abusive to her. She said he was very controlling and managed all the finances. According to Jeana, M.D.'s relationship with her father was strained. David yelled at M.D. and made her feel bad about herself. Jeana also gave Neufeld a letter from a therapist M.D. had seen in Oklahoma, stating that M.D. said she wanted to live with her mother.

Neufeld also interviewed David who said he had been working at Kroger for 38 years. He had flexible work hours from 7 a.m. to 8:30 p.m., which allowed him to take M.D. to school at 8:45 a.m. and pick her up in the evening from an after school program at the YMCA. He had bought his home in Hutchinson in 1997.

David thought he should have custody because he was more stable and consistent while Jeana tended to act on her feelings. David told Neufeld that he knew Jeana thought he had anger and control issues. He said he did get angry with Jeana, but he had never used violence or physical force.

3

Neufeld spoke with Barbara Phillips, the school counselor at M.D.'s elementary school. Phillips said she had observed M.D. to be a happy, well-adjusted girl. She had never seen M.D. cry or any evidence that she was unhappy. She had asked M.D. if she wanted to live with her mother. M.D. had said yes, but she had her head down and did not look at Phillips when she said it. She then told Phillips that she hoped Mrs. Winters would be her teacher next year.

According to Phillips, both Jeana and David attended a parent-teacher conference in September 2015. Phillips told Neufeld that M.D. had talked baby talk around her mother, but she acted more grown up as she moved closer to her father. Phillips said her impression was that David was more stable and rational but rigid while Jeana was more emotional.

Jennifer Freund was M.D.'s second grade teacher. She told Neufeld that M.D. was well adjusted and seemed happy. According to Freund, M.D. did not cry or act sad.

Rickeal Preston, M.D.'s therapist in Oklahoma, told Neufeld over the phone that M.D. had told her she would prefer to live with her mother in Hutchinson, but if not, she wanted to live with her mother wherever her mother was. M.D. told Preston she had a harder time talking to her father, and she did not think her father could take care of her as well as her mother could. She also told Preston that her dad had pulled her down the hall by her arm.

Neufeld interviewed Deb Theis, a licensed specialist clinical social worker. David had contacted Theis to help M.D. with anxiety and loss issues. M.D. told Theis she was happy living with her dad and things were good in both her parents' homes. By their fourth session, M.D. did not appear stressed and was very affectionate with her father.

Theis also said David's style of discipline encouraged individuality, because he gave her choices, and she knew what the consequences were.

Neufeld spoke with Jan Rogers, a licensed specialist clinical social worker. Jeana saw Rogers a total of seven times for help in making the decision to get a divorce. Rogers said Jeana told her about verbal and emotional abuse in the marriage. Rogers said Jeana needed more confidence in managing her life, but Jeana loved her children and wanted what was best for them.

Neufeld spoke with M.D.'s half-siblings. Garren was a 15-year-old high school sophomore. He wanted M.D. to come live with their mother in Oklahoma. He said she had lived with him her whole life and she was not happy in Kansas. Shawna was a 20-year-old college student. She also wanted M.D. to live with their mother in Oklahoma. M.D. had lived with them her whole life, though Shawna was rarely at home now between school and work.

Based on the above information, Neufeld recommended that M.D. remain with David as primary residential custody. According to Neufeld's assessment, both Jeana and David loved M.D. and wanted what was best for her. However, M.D. was doing well in her current situation and to uproot her at that point would not be in her best interests.

The district court held a trial on December 10, 2015. Most of Neufeld's testimony was consistent with her report. Neufeld told the court that M.D.'s expressed wish to live with her mother may just have been a desire to protect her mother. She agreed that a child might be protective of a parent if he or she witnesses someone abusing that parent. She also told the court that Jeana and David had different disciplinary styles, but she did not have concerns about discipline in either household.

Phillips testified that she had not seen M.D. cry, and she had not told Jeana she had seen M.D. crying at recess. Rather, Jeana told Phillips that M.D. had said she was crying at recess. Phillips checked with the recess monitors but they had not seen M.D. crying or seeming sad. She recalled that during the parent-teacher conference, M.D. had been standing near her mother and talking baby talk. Jeana's counsel asked Phillips if M.D. was playing with a doll. Phillips did not remember M.D. playing with a doll or anything else in particular at that time. According to Phillips, if M.D. had been playing with a doll, what she was saying was not related to that.

Jeana testified that M.D. is a very bright child who loves to read. In kindergarten in Oklahoma, she won a top student award and a friendship award. If M.D. moved back to Oklahoma with Jeana, she would return to that same school.

Jeana testified that during the time she was living apart from David, she had kept him informed regarding M.D.'s school activities or if M.D. was sick or going to see the doctor. According to Jeana, the only event David attended during that 2-year period was when M.D. received the awards from her kindergarten. Jeana stated that when David had temporary residential custody, he had not kept her informed regarding events and issues in M.D.'s life. As an example, Jeana described a time when David had failed to tell her about a school carnival. When Jeana asked why he had not told her, David explained he did not think she would be able to attend. Jeana also said David had not told her about a cheering event M.D. participated in, and she was only able to see the event because a friend had recorded it on video. David had informed Jeana that M.D. had been sick and had seen the doctor a week after the appointment.

Jeana testified that her current work schedule was Monday through Friday, 8 a.m. to 4:30 p.m. M.D.'s school schedule in Oklahoma would be 7:45 a.m. to 3:30 p.m. Jeana stated she would be able to take M.D. to school, and she would attend an after-school program she had previously attended with some of her friends and cousins.

6

Jeana stated that all of her family lived in the same area of Oklahoma. Her family regularly got together, and they attend the same church as a number of her family members.

Jeana explained that the reason M.D. was talking baby talk to her at the parent-teacher conference was because M.D. was playing with dolls in a dollhouse. She recalled both she and David told M.D. not to use baby talk.

David testified and admitted he originally was not forthcoming about information regarding events in M.D.'s life, but he believed he had been doing a better job. He also contested Jeana's claim that he had not told her about the cheering event. He recalled that Jeana had told him she would not be able to make it, so she was going to have a friend record it for her.

David testified his job had flexible hours. He used to work a lot of overtime, but he had chosen not to do so since gaining temporary residential custody of M.D. He took M.D. to school in the morning and picked her up from an after-school program sometime between 4 p.m. and 5:55 p.m. According to David, before Jeana's most recent move to Oklahoma with M.D., Jeana had not given David a chance to see M.D. before they left.

David stated that during the couple's second separation he had filed a motion for change of custody. He did not pursue the motion, however, because he and Jeana were still trying to work some things out.

Jeana's counsel asked David if he had ever discussed the GAL or the court proceedings with M.D. David said that he tried not to talk about the GAL or the court proceedings with M.D. M.D., however, was bringing up the topic and sharing information about it with him. Once, while David was at the courthouse picking up

documents, M.D. asked to see the courtroom. He showed her the courtroom, and Judge Rose was in the courtroom at the time. M.D. said she wanted to see the judge. David said she could not do that, but he pointed out a picture of the judge on the wall.

Jeana's counsel also asked David if he had pointed out a house to M.D. and told her if her mother loved her, she would move back to Kansas and live there. David denied that that had ever happened. He explained that when the couple first separated, he did not know if he would get to keep the house. He had started looking for rental properties in the same neighborhood so M.D. could stay in the same school district if he had to move. At one time, he pointed out a rental property to M.D. and said if Jeana moved back to Kansas, either David or Jeana could live there. When asked if he told M.D. she did not have a say in where she lived, David responded, "[M.D.] should not have a say in this."

The district court granted primary residential custody to David. In its ruling from the bench, the court explained:

> "I believe [M.D.] should remain in school here and with her dad during the school year. Jeana, I would feel the same way if I were sitting in Oklahoma and Madelyn had lived in my jurisdiction that year prior and David had come to Kansas with her, you. What I'd look at would be she did well here in Oklahoma last year. Why would I change that when I've got a healthy parent who's staying at home here, what I call home, my jurisdiction. I'd feel the same way. What I'm saying is there's some impetus to a judge to say where a child has been, if she's doing okay is probably where she should stay assuming other factors are equal."

The court granted Jeana residential custody during the summer. The court noted [M.D.] was 7 and did not have a lot of summer activities so she would be able to adjust easily to moving back to Oklahoma for the summer. The court also stated, "anytime the Court looks at custody one of things I look at is which parent will best respect the relationship

8

of the child with the other parent and I think you both are doing that and I hope that continues."

The court also issued a written journal entry outlining the custody ruling. Jeana appeals.

Jeana argues the district court abused its discretion because it did not consider the relevant factors under K.S.A. 2014 Supp. 23-3203. That statute reads as follows:

"In determining the issue of child custody, residency and parenting time, the court shall consider all relevant factors, including, but not limited to:

"(a) Each parent's role and involvement with the minor child before and after separation;

"(b) the desires of the child's parents as to custody or residency;

"(c) the desires of a child of sufficient age and maturity as to the child's custody or residency;

"(d) the age of the child;

"(e) the emotional and physical needs of the child;

"(f) the interaction and interrelationship of the child with parents, siblings and any other person who may significantly affect the child's best interests;

"(g) the child's adjustment to the child's home, school and community;

"(h) the willingness and ability of each parent to respect and appreciate the bond between the child and the other parent and to allow for a continuing relationship between the child and the other parent;

"(i) evidence of spousal abuse, either emotional or physical;

"(j) the ability of the parties to communicate, cooperate and manage parental duties;

"(k) the school activity schedule of the child;

"(l) the work schedule of the parties;

"(m) the location of the parties' residences and places of employment;

"(n) the location of the child's school;

9

"(o) whether a parent is subject to the registration requirements of the Kansas offender registration act, K.S.A. 22-4901 et seq., and amendments thereto, or any similar act in any other state, or under military or federal law;

"(p) whether a parent has been convicted of abuse of a child, K.S.A. 21-3609, prior to its repeal, or K.S.A. 2014 Supp. 21-5602, and amendments thereto;

"(q) whether a parent is residing with an individual who is subject to registration requirements of the Kansas offender registration act, K.S.A. 22-4901 et seq., and amendments thereto, or any similar act in any other state, or under military or federal law; and

"(r) whether a parent is residing with an individual who has been convicted of abuse of a child, K.S.A. 21-3609, prior to its repeal, or K.S.A. 2014 Supp. 21-5602, and amendments thereto."

The provisions of K.S.A. 2014 Supp. 23-3201 *et seq.* guide a district court's discretionary determination of a child's custody, residency, visitation, or parenting time. The paramount consideration in making such decisions is the child's welfare and best interests. In light of the district court's unique vantage point of what is often an emotionally charged situation, an appellate court generally will not overturn such decisions unless the court abused its discretion. See *Harrison v. Tauheed*, 292 Kan. 663, 672, 256 P.3d 851 (2011). See also *Frazier v. Goudschaal*, 296 Kan. 730, 755, 295 P.3d 542 (2013) (co-parenting agreement).

A judicial action constitutes an abuse of discretion if (1) no reasonable person would take the view adopted by the trial court; (2) the action is based on an error of law; or (3) the action is based on an error of fact. *Wiles v. American Family Life Assurance Co.*, 302 Kan. 66, 74, 350 P.3d 1071 (2015). Challenges to specific factual findings in support of such determinations are reviewed to assure that they are supported by substantial competent evidence and that they support the court's legal conclusions. See *In re Marriage of Vandenberg*, 43 Kan. App. 2d 697, 704, 229 P.3d 1187 (2010).

Supreme Court Rule 165 (2017 Kan. S. Ct. R. 214) imposes on the district court the primary duty to provide adequate findings of fact and conclusions of law on the record explaining the court's decision on contested matters. A party, however, must object to inadequate findings and conclusions to preserve an issue for appeal. Such objections necessarily give the district court an opportunity to correct any alleged inadequacies. See *Fischer v. State*, 296 Kan. 808, 825, 295 P.3d 560 (2013). K.S.A. 2016 Supp. 60-252(b) also provides a party the opportunity to file a motion requesting a trial court make additional findings after it issued its ruling.

Jeana argues the district court failed to consider relevant factors that would have favored granting custody to her, including: the desires of the child; relationship with siblings; child's adjustment to home, school, and community; and ability of each parent to appreciate the bond between the child and the other parent. Jeana admits she did not object to the journal entry or file a motion requesting more specific findings. When no objection is made to a district court's inadequate findings of fact or conclusions of law, an appellate court can presume the district court found all facts necessary to support its judgment. *State v. Dern*, 303 Kan. 384, 394, 362 P.3d 566 (2015). Where, however, the record does not support such a presumption and the lack of specific findings precludes meaningful review, an appellate court can consider a remand. See *O'Brien v. Leegin Creative Leather Products, Inc.*, 294 Kan. 318, 361, 277 P.3d 1062 (2012).

In a number of other cases, the Court of Appeals has determined that the record supported a presumption that the district court found all the facts necessary to support its judgment. Generally in those cases, the district court made some fact findings relevant to several factors under K.S.A. 2014 Supp. 23-3203 that favored one parent. The district courts also cited the statute or referenced the best interests of the child standard. See, *e.g.*, *In re Marriage of Vandenburg*, 43 Kan. App. 2d at 703-04; *In re Marriage of Nemec*, No. 115,474, 2016 WL 6031300, at *4 (Kan. App. 2016) (unpublished opinion); *Frakes v. Frakes*, No. 114,954, 2016 WL 4414021, at *8 (Kan. App. 2016) (unpublished opinion);

11

*In re Marriage of Hines*, No. 112,561, 2015 WL 4586675, at *5-6 (Kan. App. 2015) (unpublished opinion).

While the district court does not need to make specific fact findings on the record with respect to each factor listed under K.S.A. 2014 Supp. 23-3203, the district court in this case appears to have made few, if any, fact findings regarding the statutory factors. See *In re Marriage of Vandenburg*, 43 Kan. App. 2d at 703-04; *In re Marriage of Nemec*, 2016 WL 6031300, at *3. There is no citation to K.S.A. 2014 Supp. 23-3203 in either the district court's ruling from the bench or its written ruling. The court does appear to reference one of the factors under K.S.A. 2014 Supp. 23-3203(h) ("the willingness and ability of each parent to respect and appreciate the bond between the child and the other parent and to allow for a continuing relationship between the child and the other parent") when it noted, "anytime the Court looks at custody one of things I look at is which parent will best respect the relationship of the child with the other parent." Although the court found this factor did not weigh in favor of either parent, it appears from the record that the evidence weighed in favor of Jeana on this issue.

The district court's discussion regarding its rationale for granting custody to David could be construed as a finding under K.S.A. 2014 Supp. 23-3203(g) that M.D. was well adjusted to her home and school. In fact, in his brief, this is the only fact finding David readily identifies. The court also noted that M.D. was only 7 and likely had few summer activities, which could relate to K.S.A. 2014 Supp. 23-3203(d) (age of child) and (k) (school activity schedule of child). Nevertheless, the court used these facts to explain that changing custody for the summer would be an acceptable arrangement. Neither factor was used to support a finding that David should have primary residential custody.

Simply put, it is not clear from the record that the district court applied the correct legal standard. The court never referenced the best interests of the child legal standard required for custody decisions. In fact, the court explained its method as determining if

the child was doing okay in his or her current placement and, as a general rule, allowing the child to stay there "assuming all other factors are equal." This does not appear to accurately reflect the method for determining custody outlined in K.S.A. 2014 Supp. 23-3203.

Often, when parties fail to object for lack of factual findings at the district court level, that party does not prevail on appeal. In this case, however, the paucity of factual findings and absence of any clear reference to K.S.A. 2014 Supp. 23-3203 or the proper legal standard does not support a presumption that the district court made all of the necessary fact findings to support its decision. As such, meaningful appellate review is not possible. We reverse and remand this case for further factual findings and legal conclusions.

Reversed and remanded with directions.