(988 P.2d 272)
No. 82,458

In the Matter of the Marriage of MARCK R. COBB, *Appellee,* and CHERYL L. COBB, *Appellant.*

—

Opinion filed August 13, 1999.

*Sheila J. Floodman,* of Alexander, Floodman & Casey, Chartered, of Wichita, for the appellant.

*Donald E. Lambdin,* of Lambdin, Johnson, Herlocker, Soderberg & Lambdin, Chtd., and *Eldon L. Boisseau,* of Turner & Boisseau, Chtd., of Wichita, for the appellee.

Before BRAZIL, C.J., PIERRON, J., and ROGG, S.J.

PIERRON, J.: Cheryl L. Cobb, the mother of L.C., appeals the district court's decision changing residential custody of L.C. to the father, Marck R. Cobb.

Marck and Cheryl were married in 1989 in Colorado. L.C., born in 1990, was the only child of the marriage. The parties lived together for 15 months. Cheryl and L.C. moved to Wichita. Marck filed for divorce in Colorado. In 1992, Marck filed a petition under the Uniform Child Custody Jurisdiction Act in Sedgwick County District Court. The divorce action continued in Colorado while the custody issues were resolved in the Kansas courts. After an evidentiary hearing, Judge Richard Ballinger entered a joint custody order and awarded primary residential custody to Cheryl, with significant visitation given to Marck.

The issue of custody was addressed by the courts again in 1995, when Marck filed a motion requesting that the court change primary residential custody to him. Judge Ballinger denied Marck's request.

Over the next couple of years, Marck filed several motions for change of primary residential custody—the most recent in 1998.

He alleged that Cheryl had failed and refused to cooperate in the parenting of L.C., refused to provide medical information and the names of physicians who had seen L.C., refused to place L.C. on airplanes, and denied visitation and refused to make it up. The court granted an evidentiary hearing on the matter, and Judge Mark Vining presided over a 5 ½-day trial.

Judge Vining granted Marck's motion and awarded him residential custody of L.C. The judge entered an extensive ruling as to the factors he utilized. He addressed the length of time L.C. had been with Cheryl; the desire of both parents to be the residential custodian; L.C.'s wishes as to the residential parent; the interaction and interrelationship of L.C. with others; the medical issues; the adjustments on the part of L.C. that a change of custody would require; the physical health of L.C. and care by the parents; alleged child abuse; the lifestyle, living environment, and financial conditions of both parents; the moral fitness and mental health of both parents; the cooperation, or lack thereof, by the parents; L.C.'s mental health; the implications of Judge Ballinger's 1995 custody ruling; and significant events since 1995. The court denied Cheryl's motion for reconsideration.

The main issue on appeal is whether there was a material change of circumstances sufficient to justify a change in custody and whether that change was in the child's best interests.

K.S.A. 1998 Supp. 60-1610(a)(2)(A) provides: "Subject to the provisions of the uniform child custody jurisdiction act (K.S.A. 38-1301 *et seq.*, and amendments thereto), the court may change or modify any prior order of custody when a material change of circumstances is shown."

A review of Kansas cases reveals that our courts have not been very specific as to what constitutes a material change in circumstances. However, the court in *In re Marriage of Whipp*, 265 Kan. 500, Syl. ¶¶ 1-4, 962 P.2d 1058 (1998), has recently provided guidance in this area:

"The paramount question for determining custody as between the parents is what best serves the interests and welfare of the children. All other issues are subordinate thereto. The district court must determine which parent will do a better job of rearing the children and provide a better home environment."

"In order to insure that the interests of the children are fully protected from an adverse change of circumstances, K.S.A. 60-1610(a) vests the district court with continuing jurisdiction to modify a custody order. A decree awarding child custody is res judicata with respect to the facts existing at the time of the decree. However, when facts and material circumstances change, custody may be changed."

"A material change of circumstances is one that must be of a substantial and continuing nature to make the terms of the initial decree unreasonable."

"As in all child custody cases, a district court's decision should not be disturbed by an appellate court unless the district court has abused its discretion. Discretion is abused when no reasonable person would take the view adopted by the district court."

Judge Vining found that a material change in circumstances had occurred because several situations had not been remedied since Judge Ballinger's decision in 1995. Judge Vining found that at the time of the 1995 custody order, Cheryl "had created an atmosphere to make [L.C.] dependent on her which [Judge Ballinger] did not think was good, but went on to deny the motion for change of custody." Judge Vining decided it was clear that Judge Ballinger was concerned with the father/son relationship between L.C. and Marck, that L.C. needed to spend more time with Marck, and that Judge Ballinger unsuccessfully attempted to create "a normal situation where [L.C.] was able to be with his father and to develop a normal, healthy environment with him."

Judge Vining found "significant events" had occurred since Judge Ballinger's order in 1995:

(1) In March 1996, Dr. Fremont saw L.C. and found that L.C. was still parroting bad things about Marck.

(2) In the spring of 1996, there was significant controversy regarding L.C.'s tonsillectomy and whether it was necessary.

(3) From October 1996 to August 1998, there were over 20 visits to medical treatment facilities, many of which were scheduled right before L.C.'s visitations with Marck.

(4) In April 1998, there were physical abuse allegations against Marck.

(5) In June 1998, another visit with Dr. Fremont showed that L.C. was still making general bad allegations about his father with-

out specifics tied to them which led Dr. Fremont to believe that L.C. was parroting or being influenced by some environment.

(6) On August 18, 1998, Dr. Bowman felt that L.C. was picking up bad things about Marck from the environment he was living in.

In finding a change in material circumstances, Judge Vining ruled:

"So clearly from that standpoint, things have not changed as Judge Ballinger thought they should or knew they should in order for this thing to resolve itself.

"Based upon those findings and those observations, it's the Court's finding that a material change in circumstances has been shown, and, ironically, it's the fact that a material change of circumstances has not occurred that leads the Court to believe that circumstances have changed."

Cheryl contends the court's ruling revisited matters finally decided in connection with a previous motion to change custody. She argues that since the court found that a material change of circumstances had *not occurred,* the issue is resolved and the motion should have been denied.

The court clearly found that a material change in circumstances had occurred. Judge Vining was concerned that L.C. was in a dependent relationship with Cheryl and that a healthy father/son relationship did not exist between L.C. and Marck. These were the same concerns expressed by Judge Ballinger during the custody ruling in 1995. Judge Ballinger extended visitation in hope of resolving the problems. Judge Vining found that Judge Ballinger's efforts had not remedied the situation. For the most part, Cheryl does not challenge Judge Vining's finding that L.C. was in a dependent relationship with her or that a healthy father/son relationship did not exist between L.C. and Marck. Cheryl simply argues that it is unclear what "change" Judge Ballinger expected and that Judge Ballinger considered the 1995 order to not be open to reconsideration absent some "new" change in circumstances.

We believe the district court did not abuse its discretion in finding a material change in circumstances. The continued existence of a dependent relationship between L.C. and Cheryl and the nonexistence of a healthy father/son relationship between L.C. and Marck is substantial and continuing in nature and makes the continued residential custody by Cheryl unreasonable.

The failure or refusal of a residential parent to correct a significant problem in a child's life can constitute a material change in circumstances. A child's young and formative years are vital and dynamic. When time is of the essence, as it often is in the lives of children, a failure to adapt to the needs of the child changes the long-term prospects for the child. Under our statutes, this constitutes a change in circumstances.

Cheryl devotes a great deal of her brief to a complete review of the evidence. She claims the district court arbitrarily disregarded undisputed evidence that the best interests of the child would be served by the current custodial arrangement.

When reviewing an order involving the custody of children, certain basic principles guide our analysis. First and foremost, we are a court of law, not a court of fact. We are provided with a cold record of the proceedings in the district court. The trial court is in the best position to judge how the interests of the children may best be served. The judgment of the trial court will not be disturbed without an affirmative showing of an abuse in the exercise of discretion. See *Simmons v. Simmons*, 223 Kan. 639, 643, 576 P.2d 589 (1978). Unless we were to conclude that no reasonable judge would have reached the result reached below, the district court's decision must be affirmed.

A reading of Judge Vining's ruling indicates the court thoroughly considered the factors listed in K.S.A. 1998 Supp. 60-1610(a)(3)(B). Certain factors favored Cheryl, while others favored Marck. The crux of Judge Vining's decision to change custody was based on the finding that L.C. and Marck did not have a normal, healthy father/son relationship expected of an 8-year-old boy and his father.

Cheryl argues there was no evidence capable of supporting the determination that changing custody would improve L.C.'s relationship with Marck, and that no professional opinions concluded there was an urgency to establish a father/son relationship. To the contrary, several witnesses, including Kim Kadel, Dr. Bowman, Dr. Freeman, and Dr. Bryant, stressed the need for a father/son relationship and the need for continuing contact in order to establish that relationship. Dr. Bowman also testified there is a "four or five

year window" before adolescence arrives in which the father/son relationship has an opportunity to develop.

The court's ruling on Cheryl's motion to reconsider provides more insight into the lack of a normal, healthy father/son relationship. The court stated why it was in L.C.'s best interests to change custody:

(1) In order to create an atmosphere that would allow L.C. to make progress in his relationship with Marck, they needed to spend significant time together, and the court determined that a change of residential custody would be the best way to accomplish this result.

(2) It would be in L.C.'s best interest to be able to establish a positive and meaningful relationship with his father, "which is so necessary and so important, according to the psychologists, to develop."

(3) There was a limited window of opportunity to make the necessary corrections in the father/son relationship; otherwise, it would not likely occur.

The court indicated it was not going to wait for Cheryl to change. It was obvious there had not been the change in circumstances envisioned by Judge Ballinger to allow the same custodial arrangement. The court stated it was important for L.C. to have a meaningful relationship with *both* Cheryl and Marck, and the experts agreed that the father/son bond was not there. The environment provided by Cheryl was preventing such a bond. The court concluded:

"[I]f a relationship [between L.C. and Marck] is ever going to have a chance to succeed, changes must occur.

. . . .

"We have a father who loves his son, who wants to have a relationship with him, who has been an active participant in the attempts to get visitation and meaningful time. He hasn't been a father who sends his child support payment and has no contact. I've witnessed situations similar to this where the father walked away altogether. This is not the kind of father we have. He's not perfect and I understand that he has flaws just like all of us do. And this change won't happen without [its] ups and downs for the parties and for [L.C.], but it's still the Court's opinion it's in [L.C.'s] best interests and the interest of society in general to have

this change take place at this time. I think it's the last best opportunity we have to allow a normal, healthy relationship to develop between [L.C.] and his father."

There was no evidence L.C. was neglected or uncared-for by Marck in respect to L.C.'s allergies. The medical reports found L.C. to be a well-developed, well-nourished child with some minor medical problems. There was no credible evidence that Marck physically or emotionally abused L.C. The evidence indicated that L.C., now an 8-year-old, continued to sleep with Cheryl on a regular basis, despite the opinions from psychologists that it should stop, and that L.C. has no problem sleeping by himself when he is with Marck.

The court acknowledged that any transfer of custody would entail a period of adjustment for L.C. to a new home, new school, and new friends. The court set forth extensive orders to help with the transition for L.C.

Cheryl would have us reweigh all the evidence and hold that it was in L.C.'s best interests to remain with her. We simply cannot do so. There were good reasons and sufficient evidence supporting Judge Vining's decision. The court understood and applied the correct, controlling legal principles. We hold the district court did not abuse its discretion in changing primary residential custody to Marck.

Affirmed.