NOT DESIGNATED FOR PUBLICATION

No. 118,628

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Marriage of
AMANDA S. NOVACEK,
*Appellant*,

and

MARK A. NOVACEK,
*Appellee*.

MEMORANDUM OPINION

Appeal from Geary District Court; STEVEN L. HORNBAKER, judge. Opinion filed July 6, 2018. Affirmed.

*David P. Troup*, of Weary Davis, L.C., of Junction City, for appellant.

*Roger L. Unruh*, of McKone & Unruh, Chtd., of Junction City, for appellee.

Before ARNOLD-BURGER, C.J., HILL and BUSER, JJ.

PER CURIAM: Amanda S. Novacek appeals the district court's decision to grant primary residential custody of her children to their father, her ex-husband Mark A. Novacek. After a thorough review of the evidence, we conclude that the district court's original custody decision was not an abuse of discretion. The court properly applied the statutory factors in K.S.A. 2017 Supp. 23-3203(a) and substantial competent evidence supported the facts that the court relied on.

1

Amanda also appeals the district court's denial of her motion to reconsider, or alternatively, modify the custody decision. Again, after a thorough review of the evidence presented, we find that the district court did not err in refusing to grant Amanda an evidentiary hearing on her motion to modify. Amanda failed to make a prima facie case of material change in circumstances. We affirm the decision of the district court.

FACTUAL AND PROCEDURAL HISTORY

Amanda and Mark married in Alabama in 2011 while Mark was in the Army. His career took them to several locations. The couple had two children, C.A.N. and L.G.N. After several moves, Mark was assigned to Fort Riley. The family arrived at Fort Riley in April 2016. In August 2016, Mark deployed to Afghanistan.

In November 2016, with Mark in Afghanistan, Amanda met Chris Hamilton. Because Hamilton lived in Arizona, he and Amanda talked online. Amanda stayed with family in Arizona for a few days in December 2016 and visited Hamilton. Near the end of December 2016, Amanda told Mark about her affair with Hamilton. At the end of January 2017, Amanda told Mark she wanted a divorce. When Mark returned from deployment in February 2017, he and Amanda went to a counseling session. However, the next day Amanda filed for divorce.

A few months later, Amanda obtained a job transfer to Arizona and moved there. The district court filed an interlocutory order in April 2017. It provided that the couple would share joint legal custody of the children until the finalization of the divorce. The children were to stay with Mark for the first half of that time, and then with Amanda in Arizona for the remainder.

The court subsequently held an evidentiary hearing. Both Mark and Amanda testified that the other was good with the children and that they had a collaborative

2

relationship in raising the children. Each party also called witnesses to testify about their behavior with the children. Amanda called Donna Henry, her coworker, who testified that Amanda was patient and interactive with the children. Mark called his Master Sergeant Sean Vonholtz and his friend Allison Mitchell. Vonholtz stated that while deployed Mark worked hard to maintain contact with his family. Vonholtz also had an opportunity to observe Mark with his children, as Vonholtz and Mark would bring their children to each other's houses. Vonholtz believed that Mark dealt with the children in an orderly, structured fashion, and kept them motivated and inspired. Mitchell, who met Mark because their children attend the same daycare, testified that she had many play dates with Mark and that he was a great father.

Neither Mark nor Amanda intended to stay in Kansas. At the time of the evidentiary hearing, Amanda had already moved to Arizona. Mark had plans to leave the Army and move to Minnesota. As such, much of the testimony focused on these locations.

Amanda testified that when she filed the petition for divorce, she was working at Fort Riley but looking for other jobs. She ultimately transferred to her employer's Arizona location, where she maintained the same job duties. She introduced an exhibit at the hearing which showed her job application history. In 2016, she mainly applied to jobs in Fort Riley or Manhattan. Beginning in 2017, however, the bulk of her job applications were for positions in Arizona. Amanda testified that she simply wanted to leave Kansas because of the divorce. She also testified that there was no opportunity for promotion if she stayed at Fort Riley.

In response to a discovery request, she said that she did not move to Arizona to be with Hamilton, but to move closer to her family. Amanda's sister, brother-in-law, and their children lived in Arizona. However, the sister and brother-in-law were experiencing relationship problems and her sister had a history of legal issues. Amanda testified that

3

her sister and brother-in-law were going through a divorce, but she did not realize that until she visited them in December 2016. She also agreed that her sister had a history of issues, but that her sister rarely communicated those issues to the family. Amanda knew that her sister had an arrest for possession of drugs, but knew no other facts about the arrest. She also knew that her sister was arrested for domestic violence in May 2017. Amanda did not know that her sister's driver's license had been suspended in March 2017. She also did not know that one week before the evidentiary hearing, her sister was arrested for felony theft. Amanda testified that she keeps her children away from her sister because of her sister's problems.

Mark planned to leave the military and live near his family in Minnesota. Three months after the evidentiary hearing Mark would become eligible to begin the separation process, and it would be another year after that before he could leave. Mark has a large extended family in Minnesota, and the children were familiar with them. This included Mark's grandfather, mother, two aunts and two uncles (all of whom have children), and a cousin. The children visited Minnesota at least once a year, although Mark and Amanda would try to visit at least two or three times. Mark's mother, Teri Novacek, testified that she traveled from her home in Minnesota to Junction City to visit her grandchildren at least once a month during Mark's most recent deployment. She also testified that her siblings lived near her in Minnesota and that they helped each other with family duties and had family events. Teri thought Amanda and Mark's children had developed good relationships with their cousins.

The decree of divorce was filed on August 2, 2017. The district court granted primary residential custody with Mark. The court went through the statutory factors listed in K.S.A. 2017 Supp. 23-3203(a) which guide a court's discretion in determining the best interests of the children. The court noted that most of the factors were equal, but a couple of the factors favored Mark.

4

Also in August 2017, Amanda moved back to Kansas and resumed her prior job at Fort Riley. Almost immediately she filed a motion to modify the parenting plan under K.S.A. 2017 Supp. 60-259, or alternatively K.S.A. 2017 Supp. 23-3219. Amanda argued that there was insufficient evidence to support the district court's original custody decision. She also argued that her return to Kansas from Arizona constituted a material change in circumstances that would justify modification. In her motion, Amanda alleged that Mark had not been adhering to the parenting plan. She alleged that Mark had withheld information from her, only allowed her four of six weeks of scheduled parenting time in the summer, and had "refused to allow [her] attempted phone calls with the children, instead leaving it up to a 2-year-old and 5-year-old whether they want to talk with their mother on the phone."

Before the district court held a hearing on Amanda's motion, the parties entered a mediation agreement by which they would divide their time with the children until Mark moved to Minnesota. The division was about four days per week for Mark and three for Amanda.

The district court heard arguments on Amanda's motion in October 2017. Amanda argued that she had "substantial experience functioning as a single parent." Amanda's attorney alleged that when Amanda called Mark to talk to the children, Mark would say "'They don't want to talk with you.'" The district judge said that was not a basis for changing custody, especially such a short time after he made the custody decision. The attorney also argued that Mark failed to timely inform Amanda that he sent their son to counseling. He asserted that the child needed counseling only when he stayed with Mark, and he did not experience the same issues when he was with Amanda. The district court judge asked: "I wonder what the effect of . . . treating these kids like a ping-pong ball, and trying to bounce them around, from residence to residence every two months is doing to the kids. Did she ever think of that?" Amanda's attorney added that Mark had failed to diagnose an infection in the daughter, although he did not provide specifics. Mark's

attorney argued that the custody decision should remain unaltered. It was designed with the idea that Amanda would be in Arizona and Mark would be in Minnesota. It could easily be applied to a situation in which Amanda lived in Kansas and Mark lived in Minnesota.

The district court denied Amanda's motion. The district court judge stated that he had reviewed the transcript of the custody trial and, while it was a difficult decision, it was a reasoned one. In regards to posttrial matters, the court focused on the brief amount of time that had passed between the original decision and the motion to modify. The court recognized that Mark "may not be abiding by some of the orders of the Court; that's an allegation, unproven. But it's an allegation." But the court did not think that those allegations constituted a prima facie case for material change in circumstances at that time. The court characterized the issues as "minor kind of problems that will occur in any post-divorce" period and the parties should "[l]et it ride, for a while, and see how it works." However, the judge did warn the parties to abide by its orders and not to alienate the other parent, because there could be a time that failure to do so would become more relevant.

Amanda appealed.

ANALYSIS

*The district court did not abuse its discretion in the original custody decision.*

Kansas statutes list several nonexclusive factors to guide a district court's discretion in determining legal custody, residency, and parenting time of a child. K.S.A. 2017 Supp. 23-3203. Amanda argues that the district court misapplied these statutory factors and abused its discretion in awarding primary residential custody to Mark.

6

Given the district court's unique vantage point of what is often an emotionally charged situation in child custody disputes, an appellate court generally will not overturn such decisions unless the court abused its discretion. See *Harrison v. Tauheed*, 292 Kan. 663, 672, 256 P.3d 851 (2011). A judicial action constitutes an abuse of discretion if (1) no reasonable person would take the view adopted by the trial court; (2) it is based on an error of law; or (3) it is based on an error of fact. *Wiles v. American Family Life Assurance Co.*, 302 Kan. 66, 74, 350 P.3d 1071 (2015). When a party challenges the evidence underlying the district court's decision regarding custody, "this court reviews the evidence in a light most favorable to the prevailing party below to determine if the court's factual findings are supported by substantial competent evidence and whether those findings support the court's legal conclusion." *In re Marriage of Vandenberg*, 43 Kan. App. 2d 697, 704, 229 P.3d 1187 (2010). This court cannot reweigh evidence, pass on witness credibility, or redetermine questions of fact. 43 Kan. App. 2d at 705.

The guiding principle in custody, residency, and parenting time decisions is the best interests of the child. K.S.A. 2017 Supp. 23-3201. District courts must consider "all relevant factors" before determining an issue of legal custody, residency, and parenting time of a child. K.S.A. 2017 Supp. 23-3203(a). As indicated, the nonexclusive factors for consideration are set out by statute:

> "(1) Each parent's role and involvement with the minor child before and after separation;
> "(2) the desires of the child's parents as to custody or residency;
> "(3) the desires of a child of sufficient age and maturity as to the child's custody or residency;
> "(4) the age of the child;
> "(5) the emotional and physical needs of the child;
> "(6) the interaction and interrelationship of the child with parents, siblings and any other person who may significantly affect the child's best interests;
> "(7) the child's adjustment to the child's home, school and community;

"(8) the willingness and ability of each parent to respect and appreciate the bond between the child and the other parent and to allow for a continuing relationship between the child and the other parent;

"(9) evidence of domestic abuse . . . ;

"(10) the ability of the parties to communicate, cooperate and manage parental duties;

"(11) the school activity schedule of the child;

"(12) the work schedule of the parties;

"(13) the location of the parties' residences and places of employment;

"(14) the location of the child's school;

"(15) whether the parent is subject to the registration requirements of the Kansas offender registration act . . . or any similar act in any other state, or under military or federal law;

"(16) whether a parent has been convicted of abuse of a child . . . ;

"(17) whether a parent is residing with an individual who is subject to registration requirements of the Kansas offender registration act . . . or any similar act in any other state, or under military or federal law; and

"(18) whether a parent is residing with an individual who has been convicted of abuse of a child . . . ." K.S.A. 2017 Supp. 23-3203(a).

The district court need not explicitly mention each of the statutory factors in its analysis, but here the court did. See *In re Marriage of Vandenberg*, 43 Kan. App. 2d at 703-04.

The district court held that, as for the first factor, "mother had more to do with the children before the separation" because of Mark's deployment and military duties. The sixth factor, however, weighed in favor of Mark. The district court thought that the fact that Mark had many relatives in Minnesota, where Mark intended to move, would benefit the children. The district court seemed to give the most significant weight to the thirteenth factor, specifically the location of the parties' residences, calling it "a huge problem in this case."

8

"The mother . . . chose to, after a very brief time, in my opinion, of so-called—what's the word—messaging back and forth, you know, suddenly she's off to Arizona in a relationship with Mr. Hamilton, who testified here today. And I appreciate you coming, sir. But that, to me, doesn't bode well in this instance. I think that's caused the problems, and I—in this case that exist now.

"I think that, looking for work, and getting out of her situation wasn't the only reason she moved to Arizona. It may have been at first, but it certainly wasn't at the end. I think she moved there for Mr. Hamilton and for his benefit."

The district court held that the remaining factors either weighed equally for each parent or did not apply in the case. Amanda discusses four of the factors in her appellate brief. We will examine these factors more closely.

*Each parent's role and involvement with the minor child before and after separation.*

Amanda states that the court "implicitly found this factor to be in balance between the parents, which is contrary to the evidence and, Amanda asserts, based upon the court's legal error in its application." She argues that "[t]he court should have found this factor heavily weighted to Amanda's side, but apparently was unwilling to do so because he felt it would be punishing Mark for his military service." She concludes that "[f]or the court to basically ignore this factor as an homage to Mark's military service, while perhaps patriotic, was legally wrong and an abuse of discretion."

Contrary to Amanda's assertion that the district court found this factor to be in balance, the district court explicitly stated that the factor favored Amanda. The district court did not state that it was excusing Mark's absence, it merely noted the reason for the absence was military service. While this factor did not lead the district court ultimately to

9

award primary residential custody to Amanda, it does not appear that the district court misapplied the law or abused its discretion.

> *The interaction and interrelationship of the child with parents, siblings, and any other person who may significantly affect the child's best interests.*

Amanda notes that the district court looked at two primary factors in concluding that this factor weighed in Mark's favor: Mark's family relationships and testimony from his acquaintances. Amanda argues that there "was nothing in the record to support the court's apparent finding that Master Sergeant Vonholtz and Allison Mitchell were of greater significance to the children's lives than was Donna Henry." She also argues that the court placed too much weight on the presence of Mark's family in Minnesota.

The district court did not abuse its discretion on this factor. If Amanda had primary residential custody in Arizona, the people surrounding the children and contributing to their best interests would be limited to Amanda's brother-in-law and a niece. Amanda testified that she kept her children away from her sister, and readily admitted that her sister has many issues. By awarding Mark primary custody, the children would be surrounded by a large number of familiar family members. The evidence showed that Mark's family members acted as a support net for one another. Additionally, Mark's mother often visited the children and developed relationships with them. The district court could reasonably conclude that the children's best interests would be served in such an environment.

Amanda argues that the district court made its decision based on who had more family members, and that such an analysis is inappropriate under the statute. Yet the evidence went beyond the quantity of family members. The parties presented evidence on the quality of the children's relationships with family members and the parties' relationships with their families. Amanda's testimony about her sister was especially

10

concerning, and it was not an abuse of discretion for the district court to find that the children's best interests would be served by living in a less hectic environment.

Amanda also characterizes the district court's decision as based on the amount of previous interaction the children had with their extended family. She argues that, "[a]ssuming a past relationship with collateral relatives should be a balance-tipping consideration, it was undisputed that Amanda and the children had lived with her parents in northern Kentucky for 3 months when Mark was on temporary duty in Alabama." However, the district court did not engage in such a mechanical analysis. It was looking toward the future, a future where the children would primarily reside in either Arizona or Minnesota. It was appropriate for the district court to focus on the family relationships in those two states.

As a final note, Amanda characterizes the district court's statements about Vonholtz's and Mitchell's testimony as a finding that they were of greater significance to the children's lives than her witness, Donna Henry, was. Vonholtz's and Mitchell's testimony established that Mark could foster his children's relationships with other children. Henry's testimony was more focused on how Amanda interacted with the children. Henry did not testify that she herself interacted with the children. It was not an abuse of discretion for the district court to make note that the testimony established that Mark promoted his children's relationships with others.

*The willingness and ability of each parent to respect and appreciate the bond between the child and the other parent and to allow for a continuing relationship between the child and the other parent.*

The district court found that the parents were equal in regards to this factor. Amanda argues that "the evidence does not support an equal balancing on this factor."

11

Amanda characterizes her testimony on this issue "as generally being positive and not focused on denigrating and degrading Mark." However, during the trial Mark introduced evidence of Amanda's Facebook messages with Hamilton, as well as entries in her diary. Amanda uses this to argue now that the "fact that [Mark] 'borrowed' her phone to access her private and personal communications and thoughts does not speak highly of his character." Amanda also asserts that Mark "had a significant portion of his mother's testimony directed to criticism of Amanda." She concedes that "there was no direct evidence presented at trial that either Mark or his mother attempted to denigrate Amanda to the children," but argues that "it is more likely than not that he has failed to partition off his obvious anger and insulate the children from it."

That Mark introduced into evidence Amanda's personal messages to Hamilton does not mean that he will fail to allow for a continuing relationship between the children and Amanda. Mark testified that he would be "[v]ery supportive" of Amanda's relationship with the children should he be granted primary residential custody. He noted that while they were separated she called every day, and that every day he encouraged the children to speak to her. Mark also sent her photos of the children. Amanda's testimony corroborated this, noting that she could speak to the children every day and that Mark sent her photos. The testimony established that neither parent spoke poorly of the other or tried to prevent the other from communicating with the children. The district court did not abuse its discretion in finding that this factor weighed equally for each parent.

*The location of the parties' residences and places of employment.*

This was a weighty factor in the district court's decision, and the district court thought it weighed in favor of Mark. Neither party intended to remain in Kansas. Amanda had already moved to Arizona at the time of the evidentiary hearing, and Mark had plans to move to Minnesota. Amanda notes that she "was moving to Arizona where she had lived previously, where she had a good job with an immediate opportunity for

12

advancement, and where she, yes, had a strong romantic relationship that she hoped would lead to something more." She contrasts this with Mark, who "was leaving a well-paying job, moving to a place he had not previously lived and where he had no job lined up, because he wanted to live with or near his Mom." Amanda argues that rather than basing its decision on objective factors, the court's decision was "a moralistic judgment of disapproval against Amanda." Mark replies that "[t]he court needed to address the long term residential placement for the Novacek children and found that Mark's plan of relocation to an area with an involved extended family was in the children's best interest as opposed to residing in Arizona with Amanda and her boyfriend."

The district court did not believe that looking for work was the only reason Amanda moved to Arizona; it thought she also moved for Hamilton. This was not an abuse of discretion. It was a credibility decision which this court cannot redetermine. Given her relationship with Hamilton and the abrupt change in her job search after meeting him, there was substantial competent evidence to support the district court's belief. The fact that Mark did not yet have a job in Minnesota is hardly consequential, as his ability to leave the Army was still over a year away at the time of the hearing. This would afford Mark ample time to search for a new job. Additionally, the district court had evidence to conclude that the children would be around many family members who could help in their upbringing if their primary residence was in Minnesota. Amanda only had a sister in Arizona, and she testified that she keeps her children away from her sister.

*Conclusion*

In sum, the district court did not err in its application of the K.S.A. 2017 Supp. 23-3203(a) factors. Substantial competent evidence supports the district court's factual findings. And the legal conclusion made from those factual findings constitutes no abuse of discretion.

13

*The district court did not err in denying Amanda's motion to alter or amend the judgment.*

Amanda also argues that the district court erred in dismissing her combined motion to alter or amend judgment and motion to modify.

This court reviews a district court's decision on a K.S.A. 2017 Supp. 60-259(f) motion for abuse of discretion. A judicial action constitutes an abuse of discretion if (1) no reasonable person would take the view adopted by the trial court; (2) it is based on an error of law; or (3) it is based on an error of fact. *Wiles*, 302 Kan. at 74.

"The purpose of K.S.A. 60-259(f) is to allow the trial judge the opportunity to correct prior errors." *Denno v. Denno*, 12 Kan. App. 2d 499, 501, 749 P.2d 46 (1988). Several grounds for a district court to alter or amend its judgment are listed in K.S.A. 2017 Supp. 60-259(a)(1):

"(A) Abuse of discretion by the court, misconduct by the jury or an opposing party, accident or surprise that ordinary prudence could not have guarded against, or because the party was not afforded a reasonable opportunity to present its evidence and be heard on the merits of the case;

"(B) erroneous rulings or instructions by the court;

"(C) the verdict, report or decision was given under the influence of passion or prejudice;

"(D) the verdict, report or decision is in whole or in part contrary to the evidence;

"(E) newly discovered evidence that is material for the moving party which it could not, with reasonable diligence, have discovered and produced at the trial; or

"(F) the verdict, report or decision was procured by corruption of the party obtaining it, and in this case, the new trial must be granted as a matter of right, and all costs incurred up to the time of granting the new trial must be charged to the party obtaining the verdict, report or decision."

14

Amanda argues that the district court made an error of law when it dismissed her K.S.A. 2017 Supp. 60-259 motion because the court limited its consideration to whether Amanda had presented newly discovered evidence which she could not, with reasonable diligence, have discovered and produced at the custody hearing. She asserts that she was not making a newly discovered evidence claim, but she was asking the district court to reconsider its judgment based on subsections (A), (B), (C), or (D).

The district court did seem to focus on the newly discovered evidence issue. That said, the district judge also stated that he reviewed the transcript and, while it was not an easy decision, it was "a reasoned decision." This demonstrates that the district court considered its previous decision, and concluded that it did not need to be altered or amended. The error of law argument is the only point Amanda makes about the denial of her K.S.A. 2017 Supp. 60-259 motion. Because the district court's consideration was not limited to newly discovered evidence, the district court did not abuse its discretion. Furthermore, as discussed in the previous issue section, the district court's original custody decision was not an abuse of discretion.

*The district court did not err in dismissing Amanda's motion to modify.*

Amanda also argues that the district court erred in dismissing and refusing to hold an evidentiary hearing of her motion to modify filed under K.S.A. 2017 Supp. 23-3219.

The district court "may change or modify any prior order of custody, residency, visitation and parenting time, when a material change of circumstances is shown . . . ." K.S.A. 2017 Supp. 23-3218(a). The petitioner must file a verified motion with "all known factual allegations which constitute the basis for the change of custody or residential placement." K.S.A. 2017 Supp. 23-3219(a). If the allegations "fail to establish a prima facie case, the court shall deny the motion. If the court finds that the motion establishes a prima facie case, the matter may be tried on factual issues." K.S.A. 2017 Supp. 23-

15

3219(a). This court exercises unlimited review in determining whether a plaintiff has presented a prima facie case. *Becker v. Knoll*, 291 Kan. 204, 206, 239 P.3d 830 (2010); see also *In re Marriage of Uehling*, No. 116,466, 2017 WL 1369958, at *2 (Kan. App.) (unpublished opinion) (applying unlimited review in the context of whether a plaintiff made a prima facie case of material change of circumstances in a child custody case), *rev. denied* 306 Kan. 1318 (2017).

"[O]ur courts have not been very specific as to what constitutes a material change in circumstances." *In re Marriage of Cobb*, 26 Kan. App. 2d 388, 389, 988 P.2d 272 (1999). Even so, they have provided that a material change in circumstances "'must be of a substantial and continuing nature to make the terms of the initial decree unreasonable.'" 26 Kan. App. 2d at 390 (quoting *In re Marriage of Whipp*, 265 Kan. 500, Syl. ¶ 3, 962 P.2d 1058 [1998]).

Here, Amanda argues that the evidence in her motion to modify went to three primary issues. First, she notes that the district court was troubled by her decision to move to Arizona. She argues that she addressed this concern by returning to her old job in Kansas. Second, she argues that some things that occurred posttrial provided evidence that Mark's parenting skills were lacking. She cites Mark's failure to recognize and treat a medical issue with their daughter, although she does not specify what the issue was beyond stating that it was some type of infection. She also argues that Mark is responsible for their son's regression in potty training, which she alleges led Mark to seek counseling for the child. Third, she alleges that Mark's behavior changed significantly after trial and that he interfered with her attempts to contact the children.

The district court did not err in holding that Amanda failed to establish a material change in circumstances. Assuming that the facts alleged are true, they fail to establish that Mark was being uncooperative with the parenting plan. Amanda alleged that several times, she called Mark and he said that the children did not want to talk to her. This does

16

not show that Mark prevented the children from talking to her, it only shows that the children chose not to talk to her. Even if Mark's behavior did become less facilitating after trial, the change was not of a continuing nature. In Amanda's reply to Mark's response to her motion to modify, Amanda concedes that Mark modified the uncooperative behavior after receiving her motion. The other allegations in Amanda's petition are conclusory, and are neither substantial nor of a continuing nature. This includes taking their son to a counseling session after his potty training regression. As the district court noted, the counseling could have been required by the drastic change in the children's lives caused by their parents' divorce. This also includes Mark's alleged failure to diagnose an infection in their daughter. Amanda did not provide enough facts to determine whether the failure was substantial, and given that it only happened one time it does not appear that Mark is continually denying necessary medical care to the children.

As for Amanda's argument that her return to Kansas constitutes a material change of circumstances, that argument is unavailing. Amanda's move does not "make the terms of the initial decree unreasonable," which is what a material change in circumstances must do. See *In re Marriage of Whipp*, 265 Kan. 500, Syl. ¶ 3. The original decree was designed with the idea that the parties would live in different states—Amanda in Arizona and Mark in Minnesota. The parenting plan is equally as effective with Amanda in Kansas and Mark in Minnesota. The only difference is that the parties will have a shorter drive when transporting the children to each other. Furthermore, in her motion to modify Amanda asked the court to allow equal sharing of residency as long as geography permits it, meaning as long as she and Mark both lived in Kansas. Through mediation, Amanda could get what she asked for—a fairly equal sharing of residency. The mediated parenting plan would remain in place until Mark moved to Minnesota, at which time the district court's original parenting plan would resume.

Sometimes, a change in residence can constitute a material change in circumstances. For example, in *In re Marriage of Bradley*, 258 Kan. 39, 899 P.2d 471

17

(1995), Barbara and Dean Bradley lived in Wichita and had joint custody of their two children. As in this case, Barbara and Dean each stipulated that the other was a good parent. Barbara had primary residential custody. Barbara planned to move to Washington D.C. Dean filed a motion to change primary residential custody, arguing that Barbara's move was a material change in circumstances. The district court granted the motion, and the Kansas Supreme Court affirmed. The Kansas Supreme Court noted that "[t]he prospect of moving the children out of state . . . would necessarily end the existing co-parenting agreement" and thus constituted a material change in circumstances. 258 Kan. at 44. Here, Amanda's return to Kansas would not necessarily end the existing parenting agreement because Mark planned to move to Minnesota soon thereafter. The parenting agreement was designed to accommodate Amanda's and Mark's plans to live in different states, and Amanda's return to Kansas did not change the fact that the parties would ultimately reside in different states.

In sum, Amanda failed to allege facts which showed a material change in circumstances. While she made several allegations about Mark's abilities as a parent and his uncooperativeness when she contacted the children, the allegations were not of a substantial and continuing nature. Amanda asserted that her return to Kansas entitled her to equal parenting time so long as the parties were both in the state. Through her mediation agreement, she could achieve this end. But her return to Kansas is not such a substantial change that it renders the original parenting plan unreasonable because the original plan was designed to accommodate the parties' plans to live in different states. The district court did not err in holding that Amanda failed to make a prima facie case of a material change in circumstances. Because she failed to make a prima facie case, the district court did not have to conduct an evidentiary hearing.

Affirmed.